UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| ARTHUR WAYNE FEY,<br><br>*Plaintiff*,<br><br>v.<br><br>ROY WASHINGTON;<br>STEVE BUSH,<br>ADVANCED CORRECTIONAL HEALTHCARE, INC.;<br>TURN KEY HEALTH CLINICS, LLC,<br><br>*Defendants*. | ) | Case No. 4:24-cv-00061-TWP-KMB |

**PLAINTIFF'S SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Arthur Wayne Fey, for his Second Amended Complaint against Defendants Roy Washington, Steve Bush, Advanced Correctional Healthcare, Inc., and Turn Key Health Clinics, LLC, states as follows:

**NATURE OF THE CASE**

1. This action arises from avoidable injury, pain, and suffering sustained by Plaintiff Arthur Wayne Fey while he was a pretrial detainee at the Floyd County Jail ("FCJ") in New Albany, Indiana. Prior to his detention, Fey was undergoing regular chronic pain management relating to his cervical spine, which had generally been successful in controlling his pain level. Beginning with his detention at FCJ in June of 2022 and continuing through his release from pretrial detention at FCJ in October of 2024, Fey made repeated complaints of pain and requests for medical treatment to FCJ and its medical director, Nurse Practitioner Roy Washington. Fey repeatedly pleaded for medical care, only to be ignored, delayed, or dismissed by the FCJ staff, Washington, and nursing and health care personnel employed by Advanced Correctional

Healthcare, Inc., and Turn Key Health Clinics, LLC, the contracted medical providers for the FCJ during Fey's detention.

2. Upon Fey's release from detention, various medical specialists determined that the condition of his cervical spine had deteriorated considerably and may require surgical intervention. Fey continues to endure severe physical and mental pain, suffering, and anguish as a result of Defendants' actions and inactions.

3. This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of Fey's constitutional rights under the Fourteenth Amendment to the Constitution of the United States.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

5. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in Floyd County, Indiana, which is located within this District.

## THE PARTIES

6. Plaintiff Arthur Wayne Fey is a resident of Floyd County in the State of Indiana and at all times relevant to this Second Amended Complaint was a pretrial detainee at the Floyd County Jail located in New Albany, Indiana.

7. Defendant Roy Washington, at all times relevant to this action, was a resident of the State of Indiana and the contracted medical director of the Floyd County Jail. Defendant Washington is sued in his individual capacity.

8. Defendant Steve Bush, at all times relevant to this action, was a resident of the State of Indiana and, as of January 2023, the elected Sheriff of Floyd County, Indiana. Defendant Bush is sued in his individual capacity. In his role as Sheriff of Floyd County, Bush's office was

responsible for management and operation of the Floyd County Jail and for the implementation, oversight, and enforcement of the policies, procedures, customs, and protocols related to medical care for detainees.

9. Defendant Advanced Correctional Healthcare, Inc. ("ACH"), is a foreign for-profit corporation who was employed, retained, and/or contracted by the Floyd County Jail and/or Floyd County to provide appropriate medical services, care, and treatment to detainees at the Floyd County Jail, including Fey.

10. Defendant Turn Key Health Clinics, LLC ("TK Health"), is a foreign for-profit corporation who was employed, retained, and/or contracted by the Floyd County Jail and/or Floyd County to provide appropriate medical services, care, and treatment to detainees at the Floyd County Jail, including Fey.

11. At all times relevant to this Second Amended Complaint, Defendants Washington, Bush, ACH, and TK Health were state actors acting under color of state law and each is a "person" within the meaning of 42 U.S.C. § 1983.

12. At all times relevant to this Second Amended Complaint, Floyd County, Indiana, and/or Defendant Bush maintained a contractual relationship with either ACH and/or TK Health whereby ACH and/or TK Health would provide medical care and medical management services to individuals detained at the Floyd County Jail.

13. At all times relevant to the matters stated in this Second Amended Complaint, all Defendants acted under color of state law and within the scope of their employment and/or agency relationship.

## FACTS

14. On or about June 9, 2022, Fey was arrested and confined to the FCJ, where he remained as a pretrial detainee until his release from detention in October of 2024.

15. In February 1997, Fey was seriously injured in an automobile accident, which caused a seriously herniated cervical disc.

16. As a result of his injuries, Fey underwent a cervical fusion procedure in 1998. Complications from the procedure followed, resulting in significant pain.

17. In or around 2000, Fey was involved in another automobile accident, again sustaining severe injury to his cervical spine. Shortly after the 2000 automobile accident, Fey underwent another surgical procedure on his cervical spine.

18. While the second surgical procedure helped control Fey's pain for a time, in or around 2016 Fey began to experience severe pain in his neck. Fey was advised by a neurosurgeon around this time that another surgery on his cervical spine would be difficult and potentially risky, and he was referred to Dr. Larry Zhou, a pain management specialist located in Louisville, Kentucky.

19. Dr. Zhou was eventually able to manage Fey's chronic neck pain through a procedure by which Dr. Zhou would burn certain nerves in Fey's neck—known as radiofrequency ablation. Dr. Zhou would perform this procedure on Fey approximately every six months. In addition to the ablation procedure, Dr. Zhou would treat Fey's neck pain with epidural injections. These measures were effective in managing Fey's chronic neck pain and continued through May 2022, just prior to Fey's arrest. Fey was scheduled to undergo another ablation procedure at the end of June 2022.

20. Upon his arrest and detention at the FCJ on June 9, 2022, Fey immediately advised FCJ medical staff about his chronic neck pain and upcoming appointment with Dr. Zhou.

21. At the FCJ, inmates seek medical care by directly contacting FCJ medical staff through a kiosk/electronic tablet or by speaking to an officer directly.

22. In the weeks following Fey's initial detention, Fey sent repeated messages to FCJ staff advising of his pain and his need for medical treatment, but he was ignored, dismissed, or neglected.

23. Despite being advised of Fey's pain and ongoing necessary medical treatment with Dr. Zhou, FCJ staff failed to arrange for Fey to see Dr. Zhou or to make alternative arrangements for comparable medical treatment to address Fey's chronic neck pain.

24. Eventually, after repeated requests and delays, Fey was able to see the FCJ's contracted medical director, Roy Washington, who is a nurse practitioner—not a medical doctor.

25. In addition to the FCJ, Washington was at all times relevant hereto the primary medical director at least a dozen other jails and/or correctional facilities in Kentucky and Indiana and is on-call for those facilities twenty-four hours a day, seven days a week.

26. Washington has no specialized training on diseases or infirmities of the cervical spine.

27. Washington is not a pain management specialist.

28. At all times relevant hereto, Washington was an employee and/or agent of Advanced Correctional Healthcare, Inc., and was acting in that capacity in his encounters with Fey.

29. During his first encounter with Washington, Fey explained his medical history and his treatment with Dr. Zhou, and Fey communicated to Washington that he was in constant pain

and needed immediate medical intervention. Despite this, Washington took no appropriate steps to address Fey's complaints and did not arrange for Fey to see Dr. Zhou or a comparable provider who could effectively manage Fey's pain.

30. In multiple subsequent encounters with Washington, Fey again explained he was in pain and requested to go see Dr. Zhou in order to undergo the necessary ablation procedure and/or epidural injections, which had previously been effective in managing his pain.

31. During these subsequent encounters, Washington failed to take Fey's complaints seriously and took no appropriate steps to address Fey's complaints. Washington also did not arrange for Fey to see Dr. Zhou or a comparable provider who could effectively manage Fey's pain. Throughout the course of this delay, Fey's pain continued and worsened.

32. During these same encounters, Washington offered numerous excuses as to why Fey could not see Dr. Zhou. For example, Washington claimed that he needed to see Fey's medical records from Dr. Zhou's office, but this either was not true or, if true, Washington and/or FCJ medical staff working under him failed to take steps to promptly obtain the records from Dr. Zhou's office. By way of further example, Washington advised Fey that he could not see Dr. Zhou because Dr. Zhou was located "across state lines" and Fey's criminal case was a "federal case," which in Washington's view prohibited interstate travel. Washington repeated this claim to Fey on at least two separate occasions. In reality, Fey's criminal case was not a "federal case" and, further, Dr. Zhou's office is less located less than 20 miles from the FCJ. This excuse, likewise, was either untrue or, if true, did not alleviate Washington of his duty to secure appropriate, timely medical care and treatment for Fey's chronic pain. Following these encounters, Washington took no appropriate steps to address Fey's complaints and did not arrange for Fey to see Dr. Zhou or a

comparable provider who could effectively manage Fey's pain. Throughout the course of this delay, Fey's pain continued and worsened.

33. After several months of delay, Washington claimed to have finally obtained Fey's medical records from Dr. Zhou's office but stated he and/or the FCJ medical staff were unable to open the records because they were sent via electronic mail in a "zipped" folder and Washington and/or the FCJ medical staff did not know how to open such electronic files. Following these encounters, Washington took no appropriate steps to address Fey's complaints and did not arrange for Fey to see Dr. Zhou or a comparable provider who could effectively manage Fey's pain. Throughout the course of this delay, Fey's pain continued and worsened.

34. Eventually, after many months, Washington represented to Fey that he was finally able to review his medical records from Dr. Zhou's office but had not been able to set up an appointment with Dr. Zhou's office because nobody would answer the phone. Fey advised Washington of his continued pain and need for treatment. Despite Fey's pleas, Washington took no appropriate steps to address Fey's complaints and did not arrange for Fey to see Dr. Zhou or a comparable provider who could effectively manage Fey's pain. Throughout the course of this delay, Fey's pain continued and worsened.

35. Fey's neck became severely swollen and he was suffering from one or more bulging cervical discs. Fey's pain became unbearable. Fey made multiple requests to see Washington, who after a lengthy delay finally saw Fey. During this encounter, Fey spoke with Washington but Washington did not lay hands on Fey—in fact, Washington did not even get out of his chair to examine Fey's neck. Fey asked Washington to order an MRI, but Washington believed this was unnecessary and instead advised Fey that he would order an x-ray. Fey expressed his concern to

Washington that an x-ray would not show a bulging or herniated cervical disc and reiterated his request for an MRI, but Washington ignored Fey's request and ordered the x-ray instead.

36. After another delay, the x-ray of Fey's neck was taken. Several weeks went by and Fey heard nothing from Washington or anyone else about the x-ray findings.

37. Hearing nothing from Washington or the FCJ medical staff, Fey sent a message to FCJ's medical staff asking to see a copy of the x-ray report. Fey's request was denied. Fey repeated his request and was told by an FCJ employee that the report belonged to the sheriff's department and Fey was not entitled to see it.

38. During the remainder of his pretrial detention at FCJ, Fey never saw a copy of the x-ray report and no MRI or other imaging of Fey's neck was ordered.

39. At some point in 2024, ACH ceased to be the FCJ's contracted medical provider and Washington ceased to be its medical director. Thereafter, Defendant Turn Key Health Clinics, LLC, became the FCJ's contracted medical provider and its medical and nursing personnel began providing medical care to detainees at the FCJ, including Fey.

40. For the twenty-eight months he was in FCJ custody, Fey never saw Dr. Zhou or any other provider capable of appropriately treating and/or managing his chronic pain. Defendants took no appropriate steps to address Fey's complaints and did not arrange for Fey to see Dr. Zhou or a comparable provider who could effectively manage Fey's pain. Throughout the course of this delay, Fey's pain continued and worsened.

41. On several occasions throughout the twenty-eight months he was in FCJ custody, Fey advised the State of Indiana and Floyd Superior Court Judge Maria D. Granger of his ongoing medical issues and pain and requested leave to continue treating with Dr. Zhou while in the custody

of the FCJ. Neither the State nor Judge Granger objected to Fey's request, but Defendants did not facilitate the required treatment.

42. Fey was released from FCJ in October 2024.

43. While detained in the FCJ, Fey was entirely dependent upon Defendants to secure necessary and appropriate medical care—he had no ability to call, schedule, or advocate for himself.

44. As Sheriff, Defendant Steve Bush was responsible for overseeing the operation of the Floyd County Jail, including the provision of medical care to detainees and the supervision of both custody and medical personnel. Defendant Bush was aware that Fey had submitted multiple requests for medical care and treatment and, despite this knowledge, Defendant Bush failed to take any steps to ensure Fey received appropriate medical treatment. Rather than intervene, escalate concerns, or correct the obvious breakdown in care, Defendant Bush permitted the inaction to continue. Defendant Bush's failure to act, despite knowing of the ongoing constitutional violation, facilitated and effectively condoned the misconduct of the jail and medical staff under his supervision.

45. What happened to Fey was not an isolated failure. Instead, the Floyd County Jail, under the management of Defendant Bush and his predecessors as Floyd County Sheriff, has a long and well-documented history of placing cost concerns and savings over patient care. The FCJ, under the management of Defendant Bush, has implemented or continued systemic cost-cutting measures that routinely result in delays, denials, and inadequate medical treatment for detainees. Its policies and practices include delaying or denying outside medical referrals, failing to ensure performance of basic diagnostic testing or examinations, understaffing facilities, hiring and/or permitting the hiring of unqualified or underqualified personnel, cultivating a culture whereby

detainees are viewed as malingering rather than in need of care, and failing to conduct meaningful reviews of the care provided to detainees. Despite this reality, the FCJ—under the management of Defendant Bush—has failed to implement reforms and continues to operate with deliberate indifference to the constitutional rights and medical needs to the detainees who are under its care and control, including Fey.

46. The above-described failures are evident in the Defendants' treatment of Fey. Consistent with the FCJ's customs, policies, and practices described above, Defendants failed to act with the urgency Fey's condition demanded. They denied or delayed necessary care, ignored escalating symptoms, failed to coordinate medical appointments or ensure continuity of care, and neglected to adequately or effectively treat Fey's pain and underlying conditions. Their conduct was objectively unreasonable and caused Fey to suffer avoidable, agonizing pain which continues to this day.

47. Fey's experience was emblematic of routine failures in care at the FCJ. These practices were known to Defendant Bush, who failed to implement oversight, training, or accountability measures. The FCJ's reputation for medical neglect was widely known among FCJ personnel and detainees.

48. These practices were known to Floyd County officials, who failed to implement oversight, training, or accountability measures. County officials relied on ACH and TK Health's limited model of care to minimize costs and institutional workload, even when it meant denying essential care.

49. Through these persistent practices and failures to intervene, Floyd County, including its Sheriff Department, established and enforced a policy and culture in which serious medical needs were ignored, and detainee health was deprioritized in favor of cost savings and

convenience. These customs were the moving force behind the constitutional violations suffered by Fey.

50. ACH is the country's largest private provider of jail healthcare, with contracts in over 300 jails across 22 states. In its promotional materials, ACH highlights its ability to save jails money—savings that are achieved, in part, by limiting access to necessary medical care and cutting corners in ways that compromise constitutionally adequate treatment.

51. TK Health is a for-profit private provider of jail healthcare, with contracts in jails in at least 16 states, including Indiana. TK Health advertises its ability to "enhance the delivery of healthcare for correctional facilities while controlling the program's financial burdens for the citizens of the community." TK Health accomplishes this, in part, by limiting access to necessary medical care and cutting corners in ways that compromise constitutionally adequate treatment.

52. Both ACH and TK Health have long and well-documented histories of placing profits over patient care. Both have implemented systemic cost-cutting measures that routinely result in delays, denials, and inadequate medical treatment for detainees. Its policies and practices include delaying or denying outside medical referrals, failing to conduct basic diagnostic testing or examinations, understaffing facilities, hiring underqualified personnel, training staff to view detainees as malingering rather than in need of care, and failing to conduct meaningful reviews of adverse outcomes or deaths. These systemic deficiencies have led to repeated lawsuits and settlements involving avoidable inmate injuries and deaths—including in Indiana and neighboring states. Despite this reality, both ACH and TK Health have failed to implement reforms and continue to operate with deliberate indifference to the constitutional rights and medical needs of the individuals they are paid to treat. The failures exhibited in Fey's case are consistent with these patterns.

53. Following Fey's release, he saw several medical providers and specialists, who confirmed that the condition of his cervical spine has deteriorated significantly and may require surgical intervention. Fey is also treating again with Dr. Zhou.

54. As a result of Defendants' actions and inactions, Fey had suffered and continues to suffer severe physical and mental pain, suffering, and anguish.

55. Fey's injuries were not isolated or unforeseeable. They fit squarely and entirely within the FCJ's well-documented pattern of denying care, ignoring symptoms, and delaying referrals. The FCJ established and—with the knowledge and through the actions or inactions of all Defendants—implemented and continued a policy and culture in which serious medical needs were ignored and detainee health was deprioritized in favor of cost savings and convenience. The failures described herein reflect a widespread, repeated, and constitutionally deficient policy, practice or custom that was the moving force behind Fey's constitutional injuries.

## CAUSES OF ACTION

### COUNT 1: 42 U.S.C. § 1983 – DENIAL OF ADEQUATE MEDICAL CARE (DEFENDANTS WASHINGTON AND BUSH)

56. Fey incorporates the allegations set forth in Paragraphs 1 through 55 of this Second Amended Complaint as if fully restated herein.

57. Fey had an objectively serious medical need—ongoing severe and chronic cervical pain—which was being effectively managed and treated prior to his detention at the FCJ.

58. Defendants Washington and Bush took volitional acts or omissions throughout Fey's detention at the FCJ with respect to his medical needs, including delaying or denying access to evaluation and treatment, ignoring or dismissing his repeated complaints, and failing to ensure he received timely care and treatment.

59. The response and conduct of each Defendant was objectively unreasonable under the circumstances, given the severity of Fey's medical condition, the duration of his symptoms, and the availability of reasonable measures that could have prevented further harm.

60. As a direct and proximate result of each Defendant's unconstitutional conduct, Fey suffered serious harm, including prolonged and unnecessary physical pain, mental anguish, emotional distress, and permanent disfigurement, in violation of his rights under the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

61. At all times relevant hereto, Defendants were acting under color of state law. Their conduct was intentional, purposeful, knowing, willful, malicious, deliberately indifferent, carried out with reckless disregard for Fey's constitutional rights, and/or objectively unreasonable under the circumstances.

**COUNT 2: 42 U.S.C. § 1983 – FAILURE TO INTERVENE (DEFENDANTS WASHINGTON AND BUSH)**

62. Fey incorporates the allegations set forth in Paragraphs 1 through 55 of this Second Amended Complaint as if fully restated herein.

63. Defendants Washington and Bush were present and aware that Fey had an objectively serious medical need and that the other Defendant—or those who were supervised by or reported to Defendants—were failing to take reasonable steps to provide appropriate medical care.

64. Each Defendant had a realistic opportunity to intervene to prevent the violation of Fey's constitutional rights but failed to do so.

65. Each Defendant's failure to intervene was objectively unreasonable under the circumstances and contributed to the delay and denial of urgently needed medical care.

66. As a direct and proximate result of this unconstitutional failure to intervene, Fey suffered serious harm, including prolonged and unnecessary physical pain, mental anguish, emotional distress, and permanent disfigurement, in violation of his rights under the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

67. At all times relevant hereto, Defendants were acting under color of state law. Their conduct was intentional, purposeful, knowing, willful, malicious, deliberately indifferent, carried out with reckless disregard for Fey's constitutional rights, and/or objectively unreasonable under the circumstances.

**COUNT 3: 42 U.S.C. § 1983 – *MONELL* LIABILITY (DEFENDANTS ACH, AND TK HEALTH)**

68. Fey incorporates the allegations set forth in Paragraphs 1 through 55 of this Second Amended Complaint as if fully restated herein.

69. Prior to and during the events giving rise to this action, Defendants ACH and TK Health maintained and enforced policies, practices, and customs under which detainees with objectively serious medical needs were routinely denied adequate and timely medical care.

70. These policies, practices, and customs include, but are not limited to: (1) routinely ignoring or dismissing detainees' requests for medical care; (2) refusing or failing to provide treatment for serious medical conditions; (3) failing to ensure continuity of care between jail staff and contracted medical providers; (4) prioritizing cost savings and operational convenience over detainee health and safety; (5) employing insufficient or unqualified medical staff; and (6) failing or refusing to arrange for necessary outside medical treatment, even when clearly indicated.

71. These systemic failures were not unique to Fey's case. They reflect a widespread, well-documented pattern within facilities in which Defendants ACH and TK Health provide

correctional health care services, including the Floyd County Jail, that has led to repeated violations of detainees' constitutional rights.

72. These policies and practices were allowed to flourish because ACH and TK Health directly encouraged the conduct at issue by failing to discipline or retrain staff involved in prior violations and by maintaining cost-focused operational models that disincentivize referrals for outside care. These Defendants' deliberate indifference to this ongoing problem effectively ratified the misconduct.

73. ACH and TK Health's actions and omissions were also attributable to individuals with final policymaking authority, whose decisions and directives reflect and reinforce the unconstitutional practices at issue in this case.

74. In Fey's case, these practices manifested in the form of lengthy and inexcusable delays in evaluation, failure to act on emergency recommendations for specialist care, lack of follow-up on referrals, and failure to properly address Fey's medical needs.

75. These policies and customs were the moving force behind the constitutional violations suffered by Fey. Their actions and inactions were objectively unreasonable under the circumstances, as a reasonable provider or jail official in their position would have recognized the urgent need for medical intervention.

76. As a direct and proximate result, Fey suffered prolonged and unnecessary pain, emotional distress, permanent disfigurement, and the loss of a testicle, among other damages.

77. The actions and omissions of Defendants ACH and TK Health were carried out knowingly, willfully, with deliberate indifference, and in reckless disregard of Fey's constitutional rights.

## JURY DEMAND

Fey respectfully demands a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Arthur Wayne Fey respectfully requests the following relief against all Defendants named herein:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages;

C. Reasonable attorney fees and costs under 42 U.S.C. § 1988; and

D. All other relief the Court deems just and proper under the circumstances.

**DATED: January ___, 2026.**

Respectfully submitted,

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**

***/s/ Edward M. O'Brien***
Edward M. O'Brien, IN Attorney # 32092-39
100 Mallard Creek Road, Suite 250
Louisville, KY 40207
502.238.8500
502.238.7844 (fax)
edward.obrien@wilsonelser.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing was electronically filed with the Court on January ___, 2026, using the CM/ECF system, which will send notice of filing to the following counsel of record:

Carol A. Dillon
Joshua R. Taylor
BLEEKE DHILLON CRANDALL
8470 Allison Pointe Blvd., Suite 420
Indianapolis, IN 46250
carol@bleekedilloncrandall.com
joshua@bleekedilloncrandall.com
*Counsel for Defendant Roy Washington*

Justin M. Schaefer
Patrick Muldoon
BARNES MALONEY PLLC
401 W. Main Street, Suite 1600
Louisville, KY 40202
jschaefer@sbmkylaw.com
pmuldoon@sbmkylaw.com
*Counsel for Defendant Steve Bush*

***/s/ Edward M. O'Brien***
*Counsel for Plaintiff*